## SOUTHWESTERN COTTON OIL CO. et al. v. FARMERS UNION CO-OP. GIN CO. et al.

No. 21641.   June 6, 1933.

Rehearing Denied Sept. 12, 1933.

Abernathy & Howell and Melton & Melton, for plaintiffs in error.

Freeling & Box, for defendants in error.

RILEY, C. J. Herein is presented an appeal from the findings and order of the Corporation Commission in a proceeding to obtain a license for the operation of a cotton gin.

The Farmers Union Co-operative Gin Company filed with the Corporation Commission its application for license to construct and operate a cotton gin at Pauls Valley. Shortly thereafter the Farmers Gin Company of Foster, Okla., filed its application to remove its gin from the town of Foster to Pauls Valley. The Southwestern Cotton Oil Company and the Planters Gin Company filed their protest to the issuance of permits to either. They objected specifically to the issuance of a permit to the Farmers Union Co-operative Gin Company upon the ground that its system of doing business in allowing what is termed rebates to its customers constitutes discrimination contrary to the Constitution of Oklahoma and the Constitution of the United States. They further objected to the granting of permits to either applicant or both upon the ground that there were already four up-to-date gins then licensed and operating in Pauls Valley and some 14 other gins within a distance of 11 miles, and that the gins already licensed and operating within said territory were adequately and conveniently equipped to gin four times as much cotton as was grown within that trade territory.

The two applications and the protests were consolidated and a hearing had, result-

ing in the allowance of both applications. From these orders, protestants appeal.

Cotton gins were first declared by the Legislature to be public utilities and placed under the supervision of the Corporation Commission in 1915, S. L. 1915, c. 176, p. 291.

By section 3 of the Act of 1915, the Corporation Commission was given the right with respect to granting licenses for the operation of a cotton gin to take into consideration the necessity for a gin at the place of its location or proposed location, and with respect to the location of a new gin, if the facts disclosed that the ginning facilities afforded by gins already licensed were adequate for the reasonable demands for ginning at such place, the Corporation Commission was justified in denying the license. However, it was not mandatory so to do.

In 1923, ch. 191, S. L. 1923, the act was amended so as to provide that no new gin plants should be constructed, installed, or licensed or any old gin removed from one point to another until satisfactory showing had been made that such gin was a needed utility; the provision with reference to existing facilities was stricken from the act.

The act was further amended, chapter 109, S. L. 1925, by adding a proviso:

"That on presentation of a petition for the establishment of a gin to be run cooperatively, signed by 100 citizens and taxpayers of the community where the gin is to be located, the Corporation Commission shall issue a license for said gin."

This proviso was held unconstitutional in Frost. v. Corporation Commission, 278. U. S. 515, 73 L. Ed. 483.

It is first contended that there is no written statement of the reasons upon which the action of the Commission was based, filed with the record as required by section 22, art. 9, Constitution.

In Pioneer Telegraph & Telephone Company v. Westenhaver, 23 Okla. 226, 99 P. 1010, it was held that said section of the Constitution in effect requires the Commission, upon hearing an application to reduce telephone rates, to make findings of fact upon which its orders were based, and upon appeal from such, to certify the facts found by it to the Supreme Court.

That case and A., T. & S. F. Ry. Co. v. State, 27 Okla. 820, 117 P. 330, are cited and relied upon. There was an entire absence of findings of fact in those cases. Chi-

cago Ry. Co. v. Commerce Commission, 336 Ill. 51, is also cited. The findings in that case were condemned as being indefinite and uncertain. Therein it was said:

"The question before the Commission was whether public convenience and necessity required the operation of motor busses over the routes described in the coach company's petition, and an express finding of fact showing that public convenience and necessity required the operation of motor busses along certain routes and upon certain streets or highways was a condition precedent to the jurisdiction of the Commission to grant a certificate of public convenience and necessity for the operation of motor busses along such routes and over such streets and highways."

Herein the questions before the Commission were:

(a) Whether the proposed new gin and the removal of the gin from Foster to Pauls Valley were needed utilities, or whether either was a needed utility, and

(b) Whether the proposed corporation or corporations were competent and desirable corporations to establish and operate a gin.

On these questions the Commission, in the application of Farmers Union Co-operative Gin Company, found:

"Second: That applicant, Farmers Union Co-operative Gin Company, is a competent and qualified concern under the law to engage in the ginning of seed cotton for the public.

"Third: That necessity will be accommodated and convenience afforded by the granting of a license to applicant authorizing the construction, maintenance, and operation of a cotton gin at Pauls Valley."

Substantially the same findings were made as to the application of the Farmers Gin Company. This was a substantial compliance with the requirements of section 22, art. 9, of the Constitution.

It is next contended, in substance, that, inasmuch as the uncontradicted evidence is that there were already four licensed gins at Pauls Valley with capacity to gin approximately twice as much cotton as came to Pauls Valley on an average for a period of five years, another gin, and especially two other gins, could not be needed utilities at that place.

This is perhaps true, if capacity of existing licensed gins is the only thing that the Corporation Commission can take into consideration in determining whether or not another gin at a given locality is a needed

utility. The record shows that a considerable amount of cotton raised within the vicinity of Pauls Valley and which would ordinarily be taken to that point for ginning went to other smaller towns or gins located within five to eleven miles of Pauls Valley, not because of inability to get it ginned at Pauls Valley without unreasonable delay, but because the prices paid at other points for seed cotton and cotton seed were always higher in such places than at Pauls Valley. At Pauls Valley there was no co-operative gins, while at one or two of the nearby smaller towns co-operative gins were in operation. At the town of Paoli, about eight miles north of Pauls Valley, prices paid were higher than at Pauls Valley. The reason for the difference in prices does not clearly appear. It may be because of the co-operative gin at Paoli, or because of lack of storage facilities at Pauls Valley.

The ordinary commercial ginner usually is engaged not only in ginning cotton, but also in the purchase of seed cotton, that is, cotton in the seed, and cotton seed, and frequently is engaged in the purchase of cotton after it has been ginned. He has greater facilities for the purchase of the seed than anyone else. He catches the seed as they fall from the stand and has the immediate means of storing and housing same. In Oklahoma he gins the cotton and charges therefor a fixed sum set by the Corporation Commission. If the patron does not elect to sell the seed to the ginner at the price offered, he must receive and haul them away. As a rule, the patron has no place for storage so as to accommodate as much as a carload to enable him to sell seed at an advantage. Many commercial gins in Oklahoma are owned and operated by operators of cotton seed oil mills. Such apparently were the four gins in Pauls Valley, or at least three of them. They were not operating for the sole purpose of rendering a public service, but also for purchasing cotton seed on behalf of cotton seed oil mills under favorable conditions. In this part of their business they are beyond the control of the Corporation Commission, for the Commission is without power to regulate the price paid by the gins for cotton or cotton seed. If the Corporation Commission may consider only the question of existing facilities at a given point in determining whether or not another proposed gin at that point is a needed utility, then the very purpose of the law may be defeated.

In Wolf Packing Co. v. Court of Industrial Relations, 262 U. S. 522, it is said:

"The circumstances which clothe a particular kind of business with a public interest * * * must be such as to create a peculiarly close relation between the public and those engaged in it, and raise implications of an affirmative obligation on their part to be reasonable in dealing with the public."

If by common understanding among commercial ginners already licensed at a given point the prices paid by them for seed cotton and cotton seed may be continuously kept below the fair market price at that place and below the prices paid at nearby points, and no other ginners are permitted to engage in business, the effect would be to evade the rates fixed by the Commission for ginning by the simple method of paying the patron who is without means to store or house his cotton seed a price below its fair market value, and thus force him to sell at a sacrifice or seek service at a more distant place. The expense of hauling to a more distant market would in many cases be prohibitive, thus forcing the cotton grower to sell his seed below the fair market value and in effect permit the ginners to charge higher rates for ginning the cotton

From the record in the instant case it appears that this practice may have been systematically followed at Pauls Valley. The record shows that during the seasons next before the hearing there were two independent buyers at Pauls Valley, but it is not shown that they bought cotton seed or seed cotton.

The order of the Corporation Commission must be regarded as prima facie just, reasonable, and correct. Section 22, art. 9, Constitution.

We are unable to say that the prima facie presumption of the reasonableness and justness of the order of the Commission has been overcome. Atchison, T. & S. F. Ry. Co. v. State, 28 Okla. 476, 114 P. 721.

The question of the right of the Farmers Co-operative Gin Company to a license because it is organized under a law which permits it to grant patronage dividends has been definitely decided against the contention of plaintiffs in error by this court in Guthrie Cotton Oil Co. v. Farmers Custom Gin, 156 Okla. 16, 9 P. (2d) 32. It has also been so held by the Supreme Court of the United States in Corporation Commission of Okla. v. William Lowe, 281 U. S. 431, 74 L. Ed. 945.

In view of the record as a whole, we are unable to say that the orders of the Cor-

**34**

poration Commission are not supported by sufficient evidence.

The orders are therefore affirmed.

ANDREWS, McNEILL, BAYLESS, BUSBY, and WELCH, JJ., concur. CULLISON, V. C. J., and SWINDALL and OSBORN, JJ., absent.